## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

JAMIL JOYNER                                              CIVIL ACTION

VERSUS                                                    NO. 16-16595

JASON KENT                                               SECTION: "J"(1)

### REPORT AND RECOMMENDATION

Jamil Joyner,[1] a Louisiana state prisoner, filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that the application be **DISMISSED WITH PREJUDICE**.

On January 15, 2010, petitioner was convicted of attempted first degree murder under Louisiana law.[2] On March 10, 2011, he was sentenced to a term of thirty-five years imprisonment without benefit of parole, probation, or suspension of sentence.[3] On October 24, 2012, the Louisiana Fourth Circuit Court of Appeal affirmed that conviction and sentence.[4] The Louisiana Supreme Court then denied his related writ application on May 31, 2013.[5]

On August 18, 2014, petitioner, through counsel, filed an application for post-conviction relief with the state district court.[6] That application was denied on November 12, 2014,[7] and the Louisiana Fourth Circuit Court of Appeal denied his related writ application on September 2, 2015.[8] Petitioner, through counsel, then sought review of that judgment by filing a writ application

---

[1] Petitioner's first name appears in the record both as "Jamil" and "Jimil."
[2] State Rec., Vol. 10 of 20, minute entry dated January 15, 2010; State Rec., Vol. 11 of 20, jury verdict form.
[3] State Rec., Vol. 16 of 20, sentencing transcript; State Rec., Vol. 10 of 20, minute entry dated March 10, 2011.
[4] State v. Joyner, 107 So. 3d 675 (La. App. 4th Cir. 2012); State Rec., Vol. 16 of 20.
[5] State v. Joyner, 118 So. 3d 388 (La. 2013); State Rec., Vol. 18 of 20.
[6] State Rec., Vol. 1 of 20.
[7] State Rec., Vol. 4 of 20, transcript of November 12, 2014; State Rec., Vol. 2 of 20, Ruling dated November 12, 2014.
[8] State v. Joyner, No. 2015-K-0314 (La. App. 4th Cir. Sept. 2, 2015); State Rec., Vol. 17 of 20.

with the Louisiana Supreme Court.[9]  However, on September 23, 2016, that court issued its judgment declining to consider petitioner's application on the grounds that it was not timely filed.[10] Petitioner's counsel then filed an application for rehearing,[11] which was denied by the Louisiana Supreme Court on November 15, 2016.[12]

On November 25, 2016, petitioner, through counsel, filed the instant federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254.[13]  The state filed a response arguing that petitioner's application is untimely and that his claims are procedurally barred.[14]  The undersigned then granted petitioner's counsel leave to conduct discovery[15] and to submit a reply to the state's response to address the timeliness of petitioner's federal application and the applicability of the "actual innocence" exception.[16]  On October 19, 2018, petitioner's counsel then filed a reply to the state's response,[17] and the state filed a sur-reply on December 10, 2018.[18] Having carefully considered the briefs and reviewed the state court record and the applicable law, the Court finds that petitioner's federal application is indeed untimely.[19]

---

[9] State Rec., Vol. 19 of 20, writ application.

[10] State v. Joyner, No. 2015-KP-1814, 2016 La. LEXIS 1947 (La. Sept. 23, 2016); State Rec., Vol. 19 of 20.

[11] State Rec., Vol. 19 of 20, application for rehearing.

[12] State v. Joyner, 209 So. 3d 792 (La. 2016); State Rec., Vol. 19 of 20.

[13] Rec. Doc. 1.

[14] Rec. Doc. 8.

[15] Rule 6(a) of Rules Governing Section 2254 Cases in the United States District Courts provides:  "A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of the discovery."

[16] Rec. Doc. 27; Joyner v. Varga, Civ. Action No. 16-16595, 2017 WL 2972910 (E.D. La. July 12, 2017).  See McQuiggin v. Perkins, 569 U.S. 383, 386 (2013) ("We hold that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar … or … expiration of the statute of limitations.").

[17] Rec. Doc. 51.

[18] Rec. Doc. 55.

[19] Because petitioner's federal application is untimely, the Court need not make a final determination regarding the state's alternative argument that his claims are procedurally barred.  See Rec. Doc. 8, pp. 10-12.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner is generally required to bring his § 2254 claims within one (1) year of the date on which his underlying state criminal judgment became "final."  28 U.S.C. § 2244(d)(1)(A).[20]  With respect to determining the date of finality, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A).  When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court.  Roberts v. Cockrell, 319 F.3d 690, 693 (5th Cir. 2003).

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008).

As noted, the Louisiana Supreme Court denied petitioner's direct-review writ application on May 31, 2013.  Therefore, his state criminal judgment became final for AEDPA purposes on August 29, 2013.  As a result, his federal limitations period commenced on that date and then expired one year later, unless that deadline was extended through tolling.

The Court first considers statutory tolling.  Regarding the statute of limitations provided in § 2244, the AEDPA expressly states:  "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  28 U.S.C. § 2244(d)(2).  Under that provision, once a prisoner properly files a post-conviction application, that application remains "pending" for the duration of the post-conviction proceedings, *so long as* he

---

[20] Although 28 U.S.C. § 2244(d)(1) has alternative provisions providing for other events that can trigger a delayed commencement of the statute of limitations in some circumstances, petitioner concedes that those alternative provisions are inapplicable in the instant case. Rec. Doc. 51, p. 8.

continues to seek review at the higher levels of the state court system in a timely manner.  Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-71 (5th Cir. 2004).  However, if he fails to proceed to a higher level of review in a timely fashion, then his application ceases to be "pending" for the purposes of § 2244(d)(2) when his time for seeking such review expires.  Melancon v. Kaylo, 259 F.3d 401, 406 (5th Cir. 2001).

After three hundred fifty-three (353) days elapsed, petitioner tolled his federal limitations period in the instant case by filing a post-conviction application with the state district court on August 18, 2014.  When that application was denied on November 12, 2014, he timely sought review of that denial by the Louisiana Fourth Circuit Court of Appeal, as the state concedes herein.[21]  However, once the Court of Appeal denied relief on September 2, 2015, petitioner then had only thirty days to seek review by the Louisiana Supreme Court.  See Louisiana Supreme Court Rule X, § 5(a).  Although petitioner's counsel did in fact file a related post-conviction writ application with the Louisiana Supreme Court, the court refused to consider the application on the grounds that it was not filed within that thirty-day period.[22]

The United States Supreme Court has expressly held that time limits are conditions of filing and, therefore, an *untimely* state application cannot be deemed "properly filed" for the purposes of § 2244(d)(2).  Pace v. DiGuglielmo, 544 U.S. 408, 413 (2005).  Rather:  "When a postconviction petition is untimely under state law, that is the end of the matter for purposes of § 2244(d)(2)."  Id. at 414 (quotation marks and brackets omitted).  Accordingly, where, as here, the Louisiana

---

[21] Rec. Doc. 8, p. 6.
[22] State v. Joyner, No. 2015-KP-1814, 2016 La. LEXIS 1947 (La. Sept. 23, 2016) ("Not considered; untimely filed."), reconsideration denied, 209 So. 3d 792 (La. 2016); State Rec., Vol. 19 of 20.

Supreme Court has rejected a petitioner's writ application as untimely, he is entitled to no statutory tolling whatsoever for that writ application.  Williams v. Cain, 217 F.3d 303 (5th Cir. 2000).

Based on the foregoing, the undersigned finds that all statutory tolling credit for petitioner's 2014 post-conviction application therefore ceased on October 2, 2015, when his period expired for filing a timely Louisiana Supreme Court writ application.  Moreover, when his federal limitations period resumed running at that point, he had only twelve (12) days remaining.  Therefore, he had until October 14, 2015, either to file his federal application or to again toll the limitations period.

Petitioner had no "properly filed" applications pending before the Louisiana state courts during the remaining twelve (12) days of his federal limitations period.  Accordingly, he clearly is not entitled to further statutory tolling.

The Court must next consider equitable tolling.  The United States Supreme Court has expressly held that the AEDPA's statute of limitations is subject to equitable tolling.  Holland v. Florida, 560 U.S. 631, 645 (2010).  However, "equitable tolling is unavailable in most cases ...." Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999); accord Davis v. Johnson, 158 F.3d 806, 811 (5th Cir. 1998) (holding that the AEDPA's statute of limitations can be equitably tolled "in *rare and exceptional* circumstances" (emphasis added)).  Indeed, "a petitioner is entitled to equitable tolling only if he shows both that (1) he has been pursuing his rights *diligently*, and (2) some *extraordinary* circumstance stood in his way and *prevented* timely filing."  Holland, 560 U.S. at 649 (emphasis added; internal quotation marks omitted).  Regarding the two prongs of the Holland test, the United States Supreme Court has explained:

> [W]e have expressly characterized equitable tolling's two components as "elements," not merely factors of indeterminate or commensurable weight.  Pace v. DiGuglielmo, 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005) ("Generally, a litigant seeking equitable tolling bears the burden of establishing two

5

elements"). And we have treated the two requirements as distinct elements in practice, too, rejecting requests for equitable tolling where a litigant failed to satisfy one without addressing whether he satisfied the other. See, e.g., Lawrence v. Florida, 549 U.S. 327, 336-337, 127 S.Ct. 1079, 166 L.Ed.2d 924 (2007) (rejecting equitable tolling without addressing diligence because habeas petitioner fell "far short of showing 'extraordinary circumstances'"); Pace, supra, at 418, 125 S.Ct. 1807 (holding, without resolving litigant's argument that he had "satisfied the extraordinary circumstance test," that, "[e]ven if we were to accept [his argument], he would not be entitled to relief because he has not established the requisite diligence").

Menominee Indian Tribe of Wisconsin v. United States, 136 S. Ct. 750, 756 (2016).[23] A petitioner bears the burden of proof to establish entitlement to equitable tolling. Alexander v. Cockrell, 294 F.3d 626, 629 (5th Cir. 2002).

Petitioner argues that such an "extraordinary circumstance" exists in the instant case because the Louisiana Supreme Court found that his post-conviction writ application was untimely despite allegedly extenuating circumstances. However, it must be noted that "the extraordinary-circumstances prong … is meant to cover matters *outside [the litigant's] control*." Menominee Indian Tribe, 136 S. Ct. at 756 (emphasis added). See also In re Wilson, 442 F.3d 872, 875 (5th Cir. 2006) ("A petitioner's failure to satisfy the statute of limitations must result from external factors beyond his control; delays of the petitioner's own making do not qualify."). Moreover, when a petitioner argues that he is entitled to equitable tolling based on an "extraordinary circumstance," he must show that the "extraordinary circumstance stood in his way and *prevented* timely filing." Holland, 560 U.S. at 649. However: "The word 'prevent' requires the petitioner to demonstrate a causal relationship between the extraordinary circumstances on which the claim

---

[23] Menominee Indian Tribe was not a habeas corpus case. However, its equitable tolling discussion is expressly based on the Supreme Court's interpretation of Holland; therefore, the reasoning therein is applicable to habeas cases. See, e.g., Brian R. Means, Federal Habeas Manual § 9A:83 (2019).

for equitable tolling rests and the lateness of his filing, *a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances.*"  Valverde v. Stinson, 224 F.3d 129, 134 (2d Cir. 2000).

Here, the Louisiana Supreme Court's ruling that the writ application was untimely resulted directly from counsels' abdication of responsibilities wholly within their control and could have been prevented through reasonable diligence.

Counsel failed to carefully abide by Louisiana Supreme Court Rule X, a rule which even petitioner's habeas counsel candidly concedes is "indisputably clear."[24]  As previously noted, pursuant to Louisiana Supreme Court Rule X, § 5(a), a petitioner has only thirty days to file a writ application with the Louisiana Supreme Court.  In the instant case, petitioner's attorneys waited until the *thirtieth* day of that period, October 2, 2015, to attempt to file their post-conviction writ application.  However, despite the obvious precariousness of waiting until that final day, local counsel simply mailed a copy of the application to the Louisiana Supreme Court without ensuring either that it bore a postmark evidencing that it was in fact mailed on that thirtieth day or requesting an official Postal Service receipt.  That mistake proved fatal, because Rule X expressly provides:

> An application properly mailed shall be deemed timely filed if mailed on or before the last day of the delay for filing.  If the application is received by mail on the first legal day following the expiration of the delay, there shall be a rebuttable presumption that it was timely filed.  *In all cases where the presumption does not apply, the timeliness of the mailing shall be shown only by an official United States postmark or cancellation stamp or by official receipt or certificate from the United States Postal Service, or bonafide commercial mail services such as Federal Express or United Parcel Service, made at the time of mailing which indicates the date thereof.  Any other date stamp, such as a private commercial mail meter stamp, or label from an Automated Postal Center, shall not be used to establish timeliness.*

---

[24] Rec. Doc. 51, p. 11.

Louisiana Supreme Court Rule X, § 5(d) (emphasis added).  Here, the Louisiana Supreme Court did not actually receive the mailed application, which was due on October 2, 2015, until October 7, 2015.[25]  Therefore, the rebuttable presumption of timely filing did not apply.  Also, counsel was unable to prove the filing was in fact timely mailed on October 2, because the mailing envelope bore only a Pitney Bowes postage mail meter stamp, *a form of proof expressly disallowed under the rule.*  Therefore, the application was correctly found to be untimely under Rule X.

Petitioner's habeas counsel blames this debacle on the Louisiana Supreme Court, a copy and courier service,[26] and the Postal Service.  See, e.g., Rec. Doc. 51, p. 13 ("In this case, after the [Louisiana Supreme Court] discouraged him from electronically filing and after a reliable courier service had failed him, the USPS's 'failure to stamp Petitioner's' envelope with a USPS stamp has brought the parties to this point, which Joyner believes is quite extraordinary.").  However, neither the failure of a copy and courier service to print and deliver a voluminous filing[27] within a matter of hours, nor the failure of the Postal Service to postmark a *metered* mailing, strikes this Court as unusual or unforeseeable.

Moreover, in any event, this situation was easily avoidable.  Counsel should have completed the draft of the writ application earlier than the day before it was due.[28]  Further, aware

---

[25] State Rec., Vol. 1 of 20, letter to petitioner's counsel from Clerk of the Louisiana Supreme Court dated October 8, 2015; see also State Rec., Vol. 19 of 20, writ application.

[26] On the last day of the filing deadline, local counsel engaged a copy and courier service to reproduce and deliver the writ application to the Louisiana Supreme Court before the end of the business day.  However, the service later notified local counsel that it would be unable to accomplish the task as promised.  Rec. Doc. 51-1, p. 6 (affidavit of local counsel).

[27] The writ application "was over 60 pages long and, with exhibits, more than 300 pages long."  Rec. Doc. 51, p. 4.

[28] The Court understands that lawyers are often busy; however, the fact that counsel may have been "overburdened by a busy docket" is not grounds for equitable tolling.  Lookingbill v. Cockrell, 293 F.3d 256, 264 (5th Cir. 2002).  See also Schmitt v. Zeller, 354 F. App'x 950, 951-52 (5th Cir. 2009) ("We have recognized that a component of the obligation to pursue rights diligently is not to wait until near a deadline to make a filing, then seek equitable tolling when something goes awry. … Leaving little margin for error is incautious and not diligent.").

that he was filing the writ on the last possible day, local counsel should have either hand-delivered the writ application to the Louisiana Supreme Court or obtained a recognized form of evidence of timely filing, e.g., an "official receipt or certificate from the United States Postal Service." The failure to take these reasonable measures is not indicative of reasonable diligence.[29]

Petitioner's counsel then committed a further misstep:  they did not file a "protective" federal habeas corpus petition to preserve petitioner's rights.  That they should have done so is not even debatable, in that, on October 8, 2018, the Clerk of the Louisiana Supreme Court sent them a letter acknowledging their filing and expressly stating:  "This is to advise that the pleadings in the above titled matter were *received* and filed *on 10/7/2015*.  The filing was *metered* on 10/2/2015."[30]  Based on that letter, they should have known that there was a very real chance that the Louisiana Supreme Court would reject the filing as untimely under Rule X.  When faced with such a prospect, prudent attorneys would have filed a "protective" federal application – a course of action expressly suggested by the United States Supreme Court a decade earlier in Pace v. DiGuglielmo, 544 U.S. 408 (2005).  In Pace, the Supreme Court noted that when it is unclear

---

[29] Petitioner's counsel disagrees, likening this situation to cases in which a *pro se* prisoner has been granted equitable tolling when he relied on others to submit his pleadings in a timely fashion and those individuals failed him.  Rec. Doc. 51, p. 12.  That argument is wholly unpersuasive.  *Pro se* prisoners are different.  By virtue of their incarceration, they are *necessarily* at the mercy of others to submit their pleadings, *and they have little or no control over the process*.  As the United States Supreme Court has explained, it is for that very reason that they are treated more generously:

> [P]risoners cannot take the steps other litigants can take to monitor the processing of their notices of appeal and to ensure that the court clerk receives and stamps their notices of appeal before the 30-day deadline.  Unlike other litigants, *pro se* prisoners cannot personally travel to the courthouse to see that the notice is stamped "filed" or to establish the date on which the court received the notice.  Other litigants may choose to entrust their appeals to the vagaries of the mail and the clerk's process for stamping incoming papers, but only the *pro se* prisoner is forced to do so by his situation.

Houston v. Lack, 487 U.S. 266, 270-71 (1988).  Obviously, an attorney is not similarly precluded from taking adequate measures to ensure that that his filings are timely under the applicable rules.

[30] State Rec., Vol. 1 of 20, letter to petitioner's counsel from Clerk of the Louisiana Supreme Court dated October 8, 2015 (emphasis added).

whether a petitioner's state filing is timely so as to qualify him for § 2244(d)(2) tolling, he may ensure his compliance with his federal filing deadline simply "by filing a 'protective' petition in federal court and asking the federal court to stay and abey the federal habeas proceedings until state remedies are exhausted." Id. at 416. If petitioner's attorneys had followed that procedure, the instant federal application would be timely. The United States Fifth Circuit Court of Appeals has held that where, as here, a petitioner "could have elected to file a protective federal petition and request a stay, we hold that he was not *prevented* from asserting his rights, and that *equitable tolling does not apply.*" Madden v. Thaler, 521 F. App'x 316, 323 (5th Cir. 2013) (emphasis added).

For these reasons, the fact that the instant federal application is untimely is directly attributable to errors made by petitioner's attorneys concerning matters wholly within their control. Moreover, the fact that these errors were made by counsel rather than petitioner himself does not necessarily entitle him to equitable tolling for the following reasons.

Until recently, it had long been the rule in this Circuit that equitable tolling of the AEDPA's limitations period could not be based on attorney error. For example, in 2002, the United States Fifth Circuit Court of Appeals explained:

> Many courts have considered the question whether attorney error constitutes "rare and exceptional circumstances" and have held that it does not.[FN4] Additional support for the proposition that attorney error does not trigger equitable tolling is the longstanding rule that prisoners are not entitled to counsel during habeas proceedings and thus cannot state a claim for ineffective assistance during those proceedings. See Coleman v. Thompson, 501 U.S. 722, 752, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

> > [FN4]  See United States v. Marcello, 212 F.3d 1005, 1010 (7th Cir. 2000) (holding that the death of the attorney's father two weeks before filing deadline did not constitute extraordinary circumstance for equitable tolling purposes); Kreutzer v. Bowersox, 231 F.3d 460, 463 (8th Cir. 2000) (holding that attorney's confusion over applicability of § 2244(d)(1) did not justify equitable tolling), cert.

> denied, 534 U.S. 863, 122 S.Ct. 145, 151 L.Ed.2d 97 (2001); Harris v. Hutchinson, 209 F.3d 325, 330-31 (4th Cir. 2000) (holding that attorney's mistaken interpretation of § 2244(d) limitation provision did not justify equitable tolling); Taliani v. Chrans, 189 F.3d 597, 598 (7th Cir. 1999) (holding that attorney's miscalculation of limitations period was not valid basis for equitable tolling); Sandvik v. United States, 177 F.3d 1269, 1272 (11th Cir. 1999) (holding that untimeliness resulting from attorney's use of ordinary mail did not justify equitable tolling).

Cousin v. Lensing, 310 F.3d 843, 848 & n. 4 (5th Cir. 2002). The Fifth Circuit then held: "[W]e join the other circuits that have considered this issue and hold that mere attorney error or neglect is not an extraordinary circumstance such that equitable tolling is justified." Id. at 849. In a subsequent case, the Fifth Circuit further noted: "If there was ever any doubt that an attorney's error or neglect does not warrant equitable tolling, our recent decision in Cousin ... erased it ...."

United States v. Riggs, 314 F.3d 796, 799 (5th Cir. 2002). The Court of Appeals concisely stated: "Ineffective assistance of counsel is *irrelevant* to the tolling decision." Id. (emphasis added). It was held that although error or neglect may warrant professional discipline of the attorney, it simply would not justify equitable tolling of the AEDPA's statute of limitations. Id.

The United States Supreme Court had traditionally shared that view. For example, in a case in which a petitioner had been sentenced to death, the Supreme Court rejected such a bid for equitable tolling, holding:

> [Petitioner] argues that his counsel's mistake in miscalculating the limitations period entitles him to equitable tolling. If credited, this argument would essentially equitably toll limitations periods for every person whose attorney missed a deadline. Attorney miscalculation is simply not sufficient to warrant equitable tolling, particularly in the postconviction context where prisoners have no constitutional right to counsel.

Lawrence v. Florida, 549 U.S. 327, 336-37 (2007).

However, in 2010, the United States Supreme Court carved out a limited exception to that general rule, holding that, while a "garden variety claim of misconduct" does not warrant equitable

tolling, such tolling may be warranted by "far more serious instances of attorney misconduct." See Holland v. Florida, 560 U.S. 631, 651-52 (2010). Unfortunately, it is unclear precisely where the line is drawn separating a "garden variety claim of misconduct" which does not warrant tolling from egregious misconduct which does. Nevertheless, for the following reasons, this Court finds that the line was not crossed in the instant case.

As an initial matter, the errors here do not even begin to approach the level of misconduct recounted in Holland. In Holland, there was an almost complete breakdown in communication between Holland and his counsel. For example, for a two-year period during which post-conviction relief was being sought in the state courts, the attorney "communicated with Holland only three times – each time by letter." Id. at 636. The breakdown was so severe that Holland repeatedly contacted the state courts asking that his attorney be removed from the case and even filed a complaint with the bar association. Those efforts met with no success. Id. at 636-43.

Further, Holland wrote to his attorney, informing him that, if the Florida Supreme Court denied relief, the attorney must quickly seek relief in federal court before the deadline for doing so expired. Ignoring those letters, the attorney failed even to inform Holland when the Florida Supreme Court denied relief, much less file a timely federal application to preserve Holland's rights. Id. at 637-39.

When he finally contacted Holland, the attorney explained that he planned to file a petition for a writ of certiorari with the United States Supreme Court. Holland immediately responded to that letter, correctly explaining to his attorney that such an application would not toll the federal limitations period. The attorney then later wrote Holland, incorrectly stating that the federal deadline had passed before the attorney was even appointed in the state proceedings. Holland

12

again immediately responded, pointing out the attorney's legal errors in calculating the deadline and begging him to file a federal application without delay. The attorney neither responded to that letter nor filed a federal application. Id. at 640-42.

Obviously, the facts in the instant case are significantly less egregious. Petitioner's attorneys did not ignore efforts by their client to educate them. Further, while Holland's counsel ended almost all communication with his client, no such breakdown in communication existed here. And unlike Holland's thwarted efforts to obtain new appointed counsel, petitioner chose to continue with his attorneys.

In contrast, petitioner's attorneys simply missed the Louisiana Supreme Court filing deadline. However, it has been routinely held that an attorney's negligence that results in him missing a Louisiana Supreme Court filing deadline does not warrant equitable tolling. See, e.g., Young v. Rader, Civ. Action No. 11-1630, 2012 WL 1135773, at *1 (E.D. La. Apr. 4, 2012); accord Young v. Goodwin, Civ. Action No. 18-2527, 2018 WL 6252384, at *8 (E.D. La. Oct. 23, 2018) ("Missing a filing deadline hardly constitutes egregious misconduct like the Supreme Court in Holland painstakingly distinguished on the facts of that particular case."), adopted, 2018 WL 6250615 (E.D. La. Nov. 29, 2018); see also Hutchinson v. Florida, 677 F.3d 1097, 1100 (11th Cir. 2012) ("If attorney miscalculation, error, or negligence were enough for equitable tolling, the § 2244(d) statute of limitations would be tolled to the brink of extinction because in practically every case where there is a failure to meet the filing deadline an attorney is at fault."). Similarly, while counsel unwisely failed to take the precaution of filing a "protective" federal application, instead simply hoping that any ambiguities in the timeliness of their Louisiana Supreme Court writ application would ultimately be resolved in their favor, such "oversight, miscalculation or

negligence" likewise does not warrant equitable tolling.  See Waldron-Ramsay v. Pacholke, 556 F.3d 1008, 1013 (9th Cir. 2009).

In the end, counsels' errors in the instant case resulted from nothing more than garden-variety negligence, and, as such, simply do not qualify as an "extraordinary circumstance" warranting equitable tolling.  See Holland, 560 U.S. at 651-52; see also Rivas v. Fisher, 687 F.3d 514, 538 (2d Cir. 2012)  ("[I]n order to rise to the level necessary to constitute an 'extraordinary circumstance,' for purposes of tolling § 2254's limitation period, attorney negligence must be so egregious as to amount to an effective abandonment of the attorney-client relationship.").  Cf. Sandvick v. United States, 177 F.3d 1269, 1272 (11th Cir. 1999) (Sandvik's [28 U.S.C. § 2255] motion was late because his lawyer sent it by ordinary mail from Atlanta less than a week before it was due in Miami.  While the inefficiencies of the United States Postal Service may be a circumstance beyond Sandvik's control, the problem was one that Sandvik's counsel could have avoided by mailing the motion earlier or by using a private delivery service or even a private courier.  There is not, therefore, ground for equitable tolling here.").

Although this may seem harsh in that it was his *counsel's* conduct which has resulted in petitioner missing his federal filing deadline, it must be remembered that a client is normally held accountable for and bound by the errors of his counsel.  That general rule is true even for habeas corpus petitioners.  See Maples v. Thomas, 565 U.S. 266, 280-81 (2012) ("[T]he attorney is the prisoner's agent, and under well-settled principles of agency law, the principal bears the risk of negligent conduct on the part of his agent.  Thus, when a petitioner's postconviction attorney misses a filing deadline, the petitioner is bound by the oversight …." (citations and quotation marks omitted)).

Accordingly, for all of these reasons, petitioner's request for equitable tolling in the instant case should be rejected.[31]

Because petitioner (1) is not entitled to further statutory tolling, (2) has not established that he is eligible for equitable tolling, and (3) failed to file this federal application on or before the federal limitations period expired on October 14, 2015, the merits of the application may be considered by this Court only if he overcomes the limitations bar by proving that he is "actually innocent" under <u>McQuiggin v. Perkins</u>, 569 U.S. 383 (2013).

In <u>Perkins</u>, the United States Supreme Court first recognized an "actual innocence" exception to the AEDPA's statute of limitations. The Supreme Court held:

> This case concerns the "actual innocence" gateway to federal habeas review applied in <u>Schlup v. Delo</u>, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), and further explained in <u>House v. Bell</u>, 547 U.S. 518, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). In those cases, a convincing showing of actual innocence enabled habeas petitioners to overcome a procedural bar to consideration of the merits of their constitutional claims. Here, the question arises in the context of 28 U.S.C. § 2244(d)(1), the statute of limitations on federal habeas petitions prescribed in the Antiterrorism and Effective Death Penalty Act of 1996. Specifically, ... can the time bar be overcome by a convincing showing that [the petitioner] committed no crime?
>
> We hold that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in <u>Schlup</u> and <u>House</u>, or, as in this case, expiration of the statute of limitations. We caution, however, that tenable actual-innocence gateway pleas are rare: "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." <u>Schlup</u>, 513 U.S., at 329, 115

---

[31] The Court notes that the state also argues that petitioner is not entitled to equitable tolling because he waited to file his state post-conviction relief until the federal limitations period had almost expired. <u>See</u> Rec. Doc. 8, p. 8. Petitioner's counsel calls that argument "absurd." Rec. Doc. 51, p. 9. Not so. In this Circuit, such delays in seeking post-conviction relief in the state courts is considered clearly indicative of a lack of diligence for equitable tolling purposes. <u>See, e.g.</u>, <u>Schmitt v. Zeller</u>, 354 F. App'x 950, 951-52 (5th Cir. 2009) ("[Petitioner] delayed approximately ten months after his conviction was final before applying for state habeas relief. … [Petitioner]'s filing the state petition after squandering most of the year available under Section 2244 is a factor in deciding whether equitable tolling should be allowed for problems that arise in later filing the federal petition."). However, because petitioner is not entitled to equitable tolling for the reasons already noted herein, the Court need not consider this delay in the instant case.

S.Ct. 851; see House, 547 U.S., at 538, 126 S.Ct. 2064 (emphasizing that the Schlup standard is "demanding" and seldom met).

Perkins, 569 U.S. at 386.

Because Perkins utilizes the analytical framework set forth in Schlup and House, those cases and their progeny provide guidance to courts in assessing a claim of "actual innocence."

For example, in Schlup, the Supreme Court explained that, when a federal habeas court is seeking to divine what a "reasonable" juror would now find based on the proffered evidence, "[t]he word 'reasonable' in that formulation is not without meaning. *It must be presumed that a reasonable juror would consider fairly all of the evidence presented. It must also be presumed that such a juror would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt*." Schlup, 513 U.S. at 329 (emphasis added).

In House, the Supreme Court then made a number of additional observations which explained and further refined the Schlup "actual innocence" analysis. For example, the Supreme Court made clear the breadth of the evidence that a habeas court must consider, noting that "although to be credible a gateway claim requires new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial, *the habeas court's analysis is not limited to such evidence*." House, 547 U.S. at 537 (emphasis added; citation, quotation marks, and brackets omitted). Therefore: "The habeas court must consider *all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial*." Id. at 538 (emphasis added; quotation marks omitted).

The Supreme Court then went on to reiterate that a court's analysis must be juror-centric: "Based on this total record, the court must make *a probabilistic determination about what*

16

*reasonable, properly instructed jurors would do.  The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors*."  Id. (emphasis added; citation and quotation marks omitted); accord Schlup, 513 U.S. at 329 ("It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do.").   The Supreme Court also cautioned:

> [T]he Schlup standard *does not require absolute certainty about the petitioner's guilt or innocence*.  A petitioner's burden at the gateway stage is to demonstrate that *more likely than not*, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt – or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.

House, 547 U.S. at 538 (emphasis added).  The Supreme Court also explained that the analysis is therefore fundamentally different from that employed when assessing the constitutional sufficiency of evidence to support a conviction:

> [A]s the Schlup decision explains, the gateway actual-innocence standard is by no means equivalent to the standard of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which governs claims of insufficient evidence.  When confronted with a challenge based on trial evidence, courts presume the jury resolved evidentiary disputes reasonably so long as sufficient evidence supports the verdict.  Because a Schlup claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record.  If new evidence so requires, this may include consideration of the credibility of the witnesses presented at trial.

Id. at 538-39 (citations and quotation marks omitted).

Lastly, the Supreme Court has been careful to note that a federal habeas court must always bear in mind that a petitioner asserting an "actual innocence" claim faces a daunting standard.  As the Supreme Court has warned: "[T]he Schlup standard is demanding and permits review only in

the *extraordinary* case." Id. at 538 (emphasis added); accord Perkins, 569 U.S. at 386 ("We

caution, however, that tenable actual-innocence gateway pleas are rare ....").

Here, petitioner was convicted of the attempted first degree murder of New Orleans Police

Department Officer Kevin Thomas.  In pertinent part, Louisiana law defines first degree murder

as "the killing of a human being … [w]hen the offender has a specific intent to kill or to inflict

great bodily harm upon a … peace officer … engaged in the performance of his lawful duties, or

when the specific intent to kill or to inflict great bodily harm is directly related to the victim's

status as a … peace officer …." La. Rev. Stat. Ann. § 14:30(A)(2).  Louisiana law further provides:

> Any person who, having a specific intent to commit a crime, does or omits an act
> for the purpose of and tending directly toward the accomplishing of his object is
> guilty of an attempt to commit the offense intended; and it shall be immaterial
> whether, under the circumstances, he would have actually accomplished his
> purpose.

La. Rev. Stat. Ann. § 14:27(A).

In assessing petitioner's claim that he is actually innocent of that crime, a court normally

first examines the evidence presented at trial and on which the conviction was based.  See, e.g.,

Johnson v. Cain, Civ. Action No. 14-543, 2015 WL 4528889, at *3 (E.D. La. July 27, 2015), aff'd,

667 F. App'x 474 (5th Cir. 2016); Lyles v. Tanner, Civ. Action No. 13-655, 2014 WL 4674673,

at *6 (E.D. La. Sept. 17, 2014).  In the instant case, the Louisiana Fourth Circuit Court of Appeal

summarized that evidence as follows:

> This case arises out of the shooting of NOPD Officer Thomas.  The shooting
> occurred on August 30, 2005, the day after Hurricane Katrina made landfall in the
> New Orleans metropolitan area.  The shooting occurred at the Chevron convenience
> store/gas station located at the corner of General DeGaulle Avenue and Wall
> Boulevard in Algiers (the "Chevron Store").  On the day of the shooting, NOPD
> Officers Mitchell and Thomas were assigned to ride together and to patrol the
> Algiers area.  Both officers were attired in uniform shirts and blue jeans.  Both
> officers were armed with two firearms – their police issued one and a personal one.

18

At around 3:30 p.m. that day, the officers observed a broken front glass window on the Chevron Store.  When they pulled into the Chevron Store parking lot to investigate, a man walked out of the store carrying some property.  When he saw the officers, the man put the property on the ground and ran.  Two more men and a woman were also present at the Chevron Store.  The officers filled out a field information card ("FIC") on each of those three individuals and ultimately released them.

According to Officer Thomas, as the officers were completing the FIC on each of these individuals, the female told the officers that four black men with guns had been robbing people all morning at the gas station.  Officer Thomas testified that as his partner filled out an FIC card, four men approached.  (These four men were later identified as Mr. Joyner, [Vincent] Walker, Sye Carter, and Montanez Thomas.)  At this point, the same female whispered to Officer Thomas that these men were the individuals who had been robbing people all morning.  Officer Thomas immediately approached the four men and began conducting a pat-down search.

Officer Thomas explained that Mr. Joyner was the last of the four men in line to be patted down.  He first patted down Mr. Thomas and then patted down Mr. Walker.  As he approached Mr. Walker, Officer Thomas testified that the person at the end, Mr. Joyner, gave him nothing but static.  He said that Mr. Joyner was uncooperative and felt the officer was harassing him.  Officer Thomas tried to explain to Mr. Joyner that he had every reason to stop him; he indicated that he and Mr. Joyner went back and forth.  Officer Thomas testified that as he was patting down Mr. Walker, Mr. Joyner was talking steadily.  Mr. Walker told Mr. Joyner to calm down and let Officer Thomas finish what he was doing.  Officer Thomas then moved to pat down Mr. Carter.  As he was patting down Mr. Carter, Mr. Joyner shot him in the head.  Officer Thomas said that he turned to see Mr. Joyner lowering his gun and then take off running.  He said that he was a foot or two away from Mr. Joyner when Mr. Joyner shot him in the head.  At no time had he drawn his weapon, either before approaching the four men or while dealing with Mr. Walker or Mr. Thomas.  Officer Thomas testified that Mr. Walker and Mr. Joyner were the only ones who said anything and that Mr. Walker tried to calm Mr. Joyner down.  Officer Thomas further testified that the principal reason he was able to remember Mr. Joyner was because he was the only one of the men who gave him any trouble.

Officer Thomas, on cross examination, confirmed that he neither found a gun on Mr. Walker, nor saw one in his hand.  He also confirmed that Mr. Walker never talked back to him, but simply tried to calm Mr. Joyner down.  He testified that he had no recollection of anything after seeing Mr. Joyner lower the gun and run off.  He said he could not move at that time.  Also on cross examination Officer Thomas acknowledged that he probably said a few words when Mr. Joyner was mouthing off to him; however, he did not recall pushing Mr. Joyner back at any point.  He did not see where Mr. Joyner pulled the gun from.  During the investigation, he did not give a statement to either Lieutenant Austin or Detective

Harbin.  He did not recall talking to Detective Harbin over the telephone on December 2, 2005.  He was never shown a lineup to identify who shot him.

Officer Mitchell testified that after he and his partner, Officer Thomas, completed the FIC for each of the three individuals initially at the Chevron Store, he notified Officer Thomas that he was entering the store to check if anyone else was inside.  He estimated that he was inside the store for only a couple of seconds.  As he was exiting the Chevron Store, Officer Mitchell heard yelling outside and then a gunshot.  He observed a man wrestling with Officer Thomas (he later identified the man as Mr. Walker) and fighting to get Officer Thomas's long gun.  (Officer Thomas had a long assault-type weapon that was strapped on him.)

As Officer Mitchell approached Officer Thomas to assist him, a bullet whizzed past his head.  Officer Mitchell returned fire at the person who was shooting at him and then went to assist Officer Thomas.  The whizzing bullet drew his attention to the shooter.  Officer Mitchell identified Mr. Carter as the shooter.  After the exchange of gunshots, Mr. Walker stopped wrestling with Officer Thomas; and two of the four men – Mr. Carter and Mr. Joyner – fled the scene.  When Officer Mitchell approached Officer Thomas, Mr. Walker immediately got on his knees and put his hands up in the air.  At that point, Mr. Walker had been shot in the shoulder.[FN 2]  Officer Mitchell then put down one of his guns – he had one in each hand – to use Officer Thomas's radio to radio for help.  (Officer Mitchell's own radio was broken.)  At that point, the two other men – Mr. Walker and Mr. Thomas, who was by the Chevron Store's carwash – fled the scene.  When Sergeant Anderson arrived on the scene, Officer Mitchell gave him a description of the direction in which the suspects had fled.  Sergeant Anderson then radioed that information.

> [FN 2]  Officer Mitchell acknowledged that he probably inflicted Mr. Walker's gunshot wound with his personal gun.

Shortly after the suspects fled, they were apprehended on Wabash Street where Mr. Joyner lived; this location was within walking distance of the Chevron Store (the "Secondary Scene").  At that location, Officer Mitchell participated in identification procedures with, among others, Lieutenant Robert Italiano.  According to Officer Mitchell, he identified Mr. Carter as the person who shot at him.  The physical description of Mr. Carter included that he had really big ears.

At trial, Officer Mitchell identified, using a crime scene photograph, where the four men were located and what they were doing.  According to Officer Mitchell, Mr. Walker was the man who was wrestling with Officer Thomas.  Mr. Thomas was the man who was standing by the car wash.  Mr. Carter was the man who shot at him.  Mr. Joyner "was on the scene and fled" from the scene with Mr. Carter.  When asked where Mr. Joyner was located, Officer Mitchell stated that Mr. Joyner "came into vision after they started running."  He acknowledged that he never saw Mr. Joyner do anything other than run away and that he never saw Mr. Joyner with a gun.[FN 3]

[FN 3]  Officer Mitchell identified Mr. Joyner in court.

When asked which of the four men he had seen with guns, Officer Mitchell answered only Mr. Carter.  Officer Mitchell confirmed that Mr. Carter was the only one of the four men that he saw that day with a gun, that Mr. Carter was the only one who fired a gun at him, and that he did not see anyone else shoot.  He, however, acknowledged that he had no knowledge of who fired the first shot he heard when he was exiting the Chevron Store and that he did not see who shot Officer Thomas.  He did not know whether Officer Thomas had fired his weapon.

Detective Greg Joerger, a Jefferson Parish Sheriff's Office ("JPSO") criminal investigator, testified that on August 30, 2005, he responded to a radio dispatch that originated from the Chevron Store, which was located near the Orleans-Jefferson Parish line.  At that time, he was located two blocks away.  When Detective Joerger arrived on the scene, he suggested that Officer Mitchell remain with Officer Thomas.  Detective Joerger took off on foot after the four suspects.  Detective Joerger and other officers observed Mr. Walker and Mr. Joyner inside of a white, four-door BMW (the "BMW") that had just begun to move.[FN 4]  They stopped the vehicle, ordered the occupants to exit with their hands up and to get in a prone position.  The officers also observed a gun on the rear seat of the BMW in which the two men had been sitting.

[FN 4]  The BMW belonged to Mr. Joyner's grandmother, Irene Harris.  At that time, Mr. Joyner was living with his grandmother on Wabash Street.

Detective Joerger testified that Mr. Joyner exited and got on his knees, but not on the ground as ordered to by the officers.  Mr. Joyner refused to comply with several more loud commands to get on the ground.  According to Detective Joerger, Mr. Joyner then reached for the rear of his waistband.  Detective Joerger testified that before reaching for his waistband, Mr. Joyner stated that he killed one officer and that he was going to kill another because he was a "soldier."  At that point, Detective Joerger observed the butt of a handgun and used his Taser on Mr. Joyner.  Although he shot two rounds with his Taser, he only hit him with one dart (prong).  For this reason, another officer also shot Mr. Joyner with his Taser.  At that point, Mr. Joyner fell to the ground and was handcuffed.  The handgun in Mr. Joyner's waistband fell out when he was being shot with the Taser.  Detective Joerger replied in the negative when asked whether, at any point, Mr. Joyner had attempted to shoot him.  Once the scene was secured and everyone was handcuffed, Detective Joerger had no further involvement in the case.

St. Charles Parish Detective Darren Gros testified that in August 2005 he was employed by the JPSO in a one-man patrol unit.  He was two blocks away when the officer shot dispatch call came over the radio from Orleans Parish.  He arrived at the scene immediately after Detective Joerger.  He, along with other officers, ran across some yards and came out onto Wabash Street.  On Wabash

Street, they observed the occupants of the BMW attempting to flee.  Detective Gros testified that Mr. Joyner resisted loud verbal commands from several officers to get out of the driver's seat.  Although Mr. Joyner did go to his knees, he attempted to get up and to reach for a weapon.  Consistent with Detective Joerger's testimony, Detective Gros testified that Detective Joerger shot Mr. Joyner with the Taser and hit him once.  Detective Gros then successfully fired his Taser at Mr. Joyner.  Detective Gros testified that he heard Mr. Joyner state that he was a soldier.[FN 5]

> [FN 5]  Detective Gros identified Mr. Joyner in court.

Former NOPD Lieutenant Italiano testified that on August 30, 2005, he too responded to the officer shot dispatch call.  When he arrived, he found Officer Thomas in an emergency unit and Officer Mitchell on the scene.  Lieutenant Italiano testified that Officer Mitchell identified Mr. Walker and Mr. Joyner at the Secondary Scene.  According to Lieutenant Italiano, Officer Mitchell told him that all four male subjects at the Chevron Store were armed, that Mr. Joyner fired a shot at him, and that he believed that Mr. Joyner was the one who fired the shot that hit Officer Thomas.[FN 6]

> [FN 6]  Lieutenant Italiano identified Mr. Joyner in court.

On cross examination, Lieutenant Italiano confirmed that when he relocated to the Chevron Store he assumed control of the crime scene as the ranking officer present.  Eventually, Lieutenant Fred Austin assumed control of the investigation.  When asked whether he believed Officer Mitchell's trial testimony that Mr. Carter was the shooter, Lieutenant Italiano replied in the negative.  Lieutenant Italiano did not speak with Officer Thomas on the day of the shooting.

JPSO Deputy Michael Aicklen, who was assigned to the crime scene unit, testified that he processed the scene of the shooting.  It was stipulated that the seventy-three photographs the State introduced depicted the crime scene.  Deputy Aicklen identified photographs depicting both 9 mm and .45 auto caliber spent cartridge casings.

NOPD Officer Michael Thomassie arrived on the crime scene and participated in the search for the suspects on foot.  He observed three suspects entering the back door of a residence.  One of those suspects darted from a backyard shed in the 2600 block of Amazon Street, which is one street over from Wabash Street.  Officer Thomassie entered the backyard shed and discovered a black bag with a handgun protruding from it; the black bag was lying on a piece of plywood on top of the rafters.  The black bag contained more than one weapon.  One of those weapons was a revolver, which did not have any spent cartridges in it.  Officer Thomassie advised the other officers that he had discovered weapons.  He then retrieved the black bag.  To secure the black bag, he placed it in the back of the BMW, which was parked in front of the Wabash Street residence, i.e., at the Secondary Scene.  Officer Thomassie admitted on cross examination that he did

not see any of the three suspects place any type of weapon in the backyard shed. Officer Thomassie was never asked to make an identification of the suspects.

NOPD Homicide Detective Decynda Barnes testified that on the day of the shooting she went to both crime scenes. At the Secondary Scene, she interviewed Mr. Joyner's grandmother, Irma Harris, at her Wabash Street residence. Ms. Harris told her that when the men returned to the residence, someone yelled out her name and she went outside to see who it was. She said it was "Bo," Mr. Walker, and that he was bleeding. When Ms. Harris asked Mr. Walker what happened, he told her that he had been cut.

Afterward, Detective Barnes relocated to West Jefferson Hospital, where she advised Mr. Joyner of his rights.[FN 7] He then told her that "he had been knowing the other individuals involved for a minute." When recalled as a witness by the State, Detective Barnes testified that she also advised Mr. Thomas of his rights at West Jefferson Hospital and that he indicated that he understood those rights. Mr. Thomas then told her that he and some other individuals were at the Chevron Store and that he asked the officer if they could have some of the things from the store that were on the ground. He also told her that the officer with the long gun – the officer who was shot – fired shots; however, he retracted that statement.

[FN 7]  Detective Barnes identified Mr. Joyner in court.

NOPD Homicide Detective Lieutenant Fred Austin arrived at the Chevron Store at about 5:00 p.m. (the incident began around 3:30 p.m. when Officer Thomas and Mitchell arrived at the Chevron Store). Lieutenant Austin interviewed Officer Mitchell and spoke with Lieutenant Italiano. Lieutenant Austin then relocated to the Secondary Scene, where he observed Mr. Joyner lying by the driver's side door of the BMW with a gun lying next to him. Mr. Joyner had been shot down by the JPSO deputies with a Taser. Three other men, who were handcuffed, were on the curb on the passenger side of the BMW.

Lieutenant Austin testified that four guns were recovered, three handguns and a shotgun. On cross examination, he testified that no fingerprints suitable for identification purposes were found on the guns. He testified that if there was a report reflecting that there were fingerprints suitable for identification he had never seen it. Lieutenant Austin said no gunshot residue tests were performed because such testing materials were unavailable. Lieutenant Austin admitted that no photograph identification procedure was ever employed to seek an identification of the shooter from Officer Thomas. He also admitted that Officer Thomas said he really did not remember anything.

On redirect examination, Lieutenant Austin testified that on the day of the shooting Officer Mitchell informed him that as he came out of the Chevron Store he heard a gunshot, at which time he saw Mr. Walker tackling Officer Thomas onto the ground. Simultaneously, he received gunfire from Mr. Joyner, who was in the "island" of the Chevron Store gas station. Officer Mitchell returned gunfire at Mr.

23

Joyner.  Mr. Walker then began to get up off of Officer Thomas and raised a gun towards Officer Mitchell.  Officer Mitchell then shot Mr. Walker in his shoulder.

NOPD Homicide Detective Winston Harbin responded to the Secondary Scene and assisted the JPSO Crime Lab in photographing the scenes and collecting evidence.  When recalled as a defense witness, Detective Harbin testified that on December 2, 2005, he telephoned Officer Thomas to ask him if he could identify the perpetrator.  Officer Thomas told him that he could not do so.  Detective Harbin did not recall talking to Officer Thomas after December 2, 2005.  On cross examination, Detective Harbin testified that he recalled Officer Thomas mentioning a young guy who would not cooperate.

Meredith Acosta, a JPSO Crime Lab employee since 2001, was qualified by stipulation to be a firearms examination expert.  She identified her report reflecting her examination and testing of four firearms, cartridge cases, and some bullet fragments.  The four firearms were a Glock Model 36, .45 auto caliber semiautomatic pistol (the "Glock"); a Rossi Model M685 .38 caliber revolver; a Bryco Arms Model Jennings 9 mm semiautomatic pistol; and a Mossberg Model 500A 12 gauge shotgun.  Ms. Acosta was unable to test fire the Bryco Arms Jennings pistol because it was non-functional as received by the firearms unit.  The five 9mm fired/spent cartridge casings she tested had all been fired by the Intratec Model Tech-9.  This firearm was confirmed to be Officer Mitchell's personal firearm that he was carrying that day in addition to his service weapon.  It was also the firearm that he fired at Mr. Walker, striking him in the shoulder.  Ms. Acosta stated, on cross examination, that she did not have any knowledge where the Intratec Tech-9 was seized, only that it had been given to her by Detective Harbin.  Ms. Acosta determined that all seven of the spent/fired .45 auto caliber casings had been fired by the Glock, which she test-fired.  She was unable to match the bullet fragments/copper jacket fragments recovered to any firearm recovered.  Ms. Acosta confirmed, on cross examination, that none of the recovered evidence was linked to the .38 caliber Rossi revolver.  She also confirmed that the Bryco Arms Jennings 9mm pistol was non-functional and could not be test fired.

Anna Duggar, Director of the NOPD Crime Lab, was qualified by stipulation as an expert in latent prints.  She examined three handguns under the item number of the instant case: the Glock, a .38 caliber Rossi revolver, and a 9mm Bryco. She identified the three guns in evidence.  Five potential latent prints were developed on the Bryco 9mm handgun and were sent on for possible comparison.

NOPD Officer George Jackson was qualified by stipulation as an expert in fingerprint examination and comparison.  Officer Jackson testified that of the four prints sent to him, only one was suitable for identification.  He compared that fingerprint to prints of Mr. Joyner, Mr. Walker, and Mr. Carter; and he determined that it did not match prints of any of these individuals.  Officer Jackson stated on cross examination that, insofar as the accuracy of fingerprint comparison, it was one hundred percent accurate.[FN 8]

[FN 8]  Officer Jackson stated that his first report, reflecting his comparison of the single latent fingerprint to fingerprints of Mr. Walker and Mr. Carter, was dated October 17, 2006.  His second report, reflecting his comparison of that same single latent fingerprint to fingerprints of Mr. Joyner, was dated January 8, 2010, which he confirmed was shortly before trial.  He confirmed that the latent fingerprint he compared to Mr. Joyner was one of those recovered in December 2005.  He said he also was requested to compare the latent fingerprint to a "Thomas Montanez" (apparently "Mr. Thomas"); however, he was unable to obtain a set of his fingerprints that were suitable for comparison.

Lionel Parker, a retired NOPD officer, testified that in October 2005, while a NOPD officer, he was assigned to the Bureau of Alcohol, Tobacco and Firearms. He traced the Mossberg 12 gauge shotgun to Mr. Joyner.  He was unable to determine the owner of the Glock.  The Rossi .38 caliber revolver and the Bryco Arms Model Jennings 9mm pistol were traced to third party purchasers unrelated to this case.

Dr. John Steck, the neurosurgeon who treated Officer Thomas, testified that Officer Thomas sustained a gunshot wound to his head, with an entry and an exit site.  The bullet fractured the skull and drove many of the skull fragments into the left frontal lobe and farther into the brain.  The skull was opened and the fragments were removed; the brain membrane was repaired and multiple pieces of the fractured skull were fixed together with small screws and plates.  No bullet or any type of metal object was recovered from Officer Thomas's head.  Dr. Steck confirmed that Officer Thomas's breathing tube was removed on the day after surgery and that Officer Thomas was noted to be waking up and following commands.  Dr. Steck testified, on cross examination, that Officer Thomas was able to speak and was clearly improving when Dr. Steck's partner took over his care a few days after surgery.

Mr. Thomas, Mr. Joyner's brother, was called as a defense witness.  Mr. Thomas testified that on August 30, 2005, he was at Mr. Joyner's Wabash Street residence.  Three other people were present: Mr. Walker (Mr. Joyner's uncle); Mr. Carter; and Irma Harris (Mr. Joyner's grandmother).  Mr. Thomas testified that they heard on the radio that they were giving out goods, mentioning specifically that they heard that the police were letting people take goods out of Walmart.  At some point that day, they left the Wabash Street residence in Mr. Joyner's truck and went to Walmart and various other places looking for goods; in particular, they were looking for food items.  He acknowledged that he had no money.  He was unaware of whether any of the other individuals he was with had weapons on them. Eventually that day they returned to the Wabash Street residence.

Later that day, Mr. Thomas was outside the Wabash Street residence and noticed Officer Thomas alone near the Chevron Store.  He also observed some drink cans on the ground.  Mr. Thomas and the other men then walked to the Chevron Store to ask the officer if they could have the cans.  When they arrived at the store, they discovered that the cans on the ground were beer cans.  Mr. Thomas testified that none of them drank beer.  He also testified that there was also a woman

present at the Chevron Store and that the woman asked Officer Thomas if she could have some of the beer. The officer told her that she could, she gathered the beer, and she walked away. When the men first encountered Officer Thomas, Mr. Thomas testified that the officer was getting irate. He explained that Officer Thomas continually was accusing the four men of planning to ransack and loot the Chevron Store and that he was disrespecting them. Officer Thomas then began patting down the four men. He was the first one in line to be patted down. Mr. Walker was second in line. At some point after he had finished patting down Mr. Walker, Officer Thomas pushed Mr. Joyner in his face, and Mr. Joyner fell back onto Mr. Carter. Officer Thomas then took a step towards Mr. Walker. As the officer was doing so, he was raising his long gun. At that point, Mr. Thomas testified that he ran. As he was running, he heard gunshots. He did not see Officer Mitchell anywhere in the area. He subsequently saw Officer Mitchell exit the Chevron Store and begin shooting towards a field on the other side of the Chevron Store; Mr. Joyner and Mr. Carter were running across that field. Previously, Mr. Thomas had observed Officer Thomas and Mr. Walker wrestling. When asked whether he or any of the other men had a gun when they approached Officer Thomas, Mr. Thomas replied in the negative. Mr. Thomas estimated that the entire incident lasted six to eight minutes.

According to Mr. Thomas, after the shooting stopped Officer Mitchell questioned him about what had happened. Mr. Thomas told Officer Mitchell that his partner tried to kill them. Mr. Thomas said that he then told Mr. Walker that they had to get out of there. The men then proceeded to Mr. Joyner's Wabash Street residence. At Mr. Joyner's residence, Mr. Thomas gathered clothes and other things. Mr. Thomas, Mr. Joyner, and Mr. Walker got in the BMW and attempted to flee. However, as they were leaving the house and taking a left turn, they encountered the police. The police removed them from the car. Mr. Thomas, however, testified that he could not comment on how the police got Mr. Joyner out of the vehicle. According to Mr. Thomas, he saw the police Taser Mr. Joyner after he was out of the car. He did not see Mr. Joyner resisting arrest. Mr. Thomas admitted having two prior felony convictions, for burglary and theft in Alabama, for which he received a two-year suspended sentence and three years of probation.

Irma Harris, Mr. Joyner's grandmother, testified that since 2002 she had resided with Mr. Joyner at the Wabash Street residence. On August 30, 2005, she and Mr. Joyner were at the residence. Also present were Mr. Walker, Mr. Thomas, and Mr. Carter. After the hurricane passed, they left the residence to drive around and survey the damage in the community. When they returned, she took a shower. While she was in the shower, Mr. Carter came in the house through the front door. He was distraught and excited. He announced that they needed to take Mr. Walker to the hospital and that they wanted Ms. Harris to go with them. Mr. Joyner came in right after Mr. Carter; he also entered through the front door. Mr. Walker and Mr. Thomas came in almost simultaneously; Mr. Walker's shoulder was bleeding. They all got into Ms. Harris' vehicle, the BMW, and started to back out. As they did so, police came from all directions, surrounding the car and ordering them out.

Ms. Harris estimated that twelve to fifteen police officers were present. She testified that no police officer told her that any weapons were found in the residence. At no time did Ms. Harris see Mr. Joyner with a gun. She knew that Mr. Joyner had a gun that he purchased for his twenty-fourth birthday, but she had never seen it and did not know what kind it was. She testified that Mr. Joyner had a clothing store that sold jeans, t-shirts, hats, and similar items. He was also a partner with someone in a business involving refurbishing cars they purchased at auction.

On cross examination, Ms. Harris testified that they had food and water in the house. On redirect examination, Ms. Harris was reminded of the prosecutor's questions about having food and water. She replied in the negative when next asked whether, to her knowledge, Mr. Joyner or anyone else in the house had any reason to go looting that day.

It was stipulated that Deputy Kevin Murphy would testify that he collected the twenty-five articles listed in his crime scene report from the Secondary Scene and that he took photographs at both crime scenes. It also was stipulated that Captain Steven Gordon would testify that he could not fill the State's request for the 911 and radio transmissions under the item number assigned to the incident, Item # K-1392305. As noted, the incident occurred the day after Hurricane Katrina made landfall when NOPD headquarters was evacuated.[32]

The jury heard all the evidence, including numerous conflicting accounts of what occurred, and ten of them agreed Joyner was the shooter. That verdict was strongly supported by three main pieces of evidence: (1) Officer Thomas testified under oath that he was shot in the head by petitioner; (2) when petitioner was apprehended shortly after the shooting, he stated that he had already killed one officer and that he was going to kill another because he was a "soldier"; and (3) the only bullet casings found at the scene fired by a civilian's weapon were fired from the Glock that fell from petitioner's waistband at the time of his apprehension. In other words, the jury was presented with (1) an unequivocal eyewitness identification from the victim; (2) a seeming confession by petitioner; and (3) direct physical evidence linking petitioner to a gun that was fired at the scene of the shooting. Those three pieces of evidence, especially when taken together, are

---

[32] State v. Joyner, 107 So. 3d 675, 679-86 (La. App. 4th Cir. 2012); State Rec., Vol. 16 of 20.

undeniably compelling, and this Court is in no way surprised that, based on such evidence, the jurors found petitioner guilty of the attempted first degree murder of Officer Thomas, despite also hearing different accounts of what allegedly occurred from other witnesses, including law enforcement.

Petitioner nevertheless argues that the jurors reached the wrong verdict because he was not in fact the shooter. Moreover, he is represented in this matter by counsel who wanted to conduct extensive discovery to attempt to unearth "new" evidence to support that claim of actual innocence. The Court took the fairly uncommon step of granting counsel leave to conduct such discovery. Unfortunately, after almost a year of discovery and the issuance of several subpoenas, the evidence collected by counsel to support petitioner's claim of actual innocence is notably underwhelming.

The purported "new" evidence offered by petitioner's counsel in connection with the actual innocence argument is as follows:

**1.  Affidavit of Ivette Cardelli**

Cardelli is a Florida nurse practitioner who has never met Thomas. However, after reviewing copies of Thomas's medical records provided to her by petitioner's counsel,[33] she executed an affidavit stating in pertinent part:

> 5.
>
> It is my expert opinion within a reasonable degree of medical certainty that Officer Thomas was suffering from worsening memory loss as a secondary effect of the frontal lobe damage caused by a gunshot wound injury at the time he testified in January, 2010.

> 6.
>
> Records indicate that Officer Thomas clearly stated to his physicians that he was having worsening and overall general memory loss in the time period approaching his testimony in Court in January, 2010.

---

[33] Those medical records were not provided to this Court.

7.

Medical studies have clearly shown that under a stressful event, such as a court hearing or even just chronic stress, patients with frontal lobe damage, like Officer Thomas, have exaggerated impairment of memory.

8.

In my expert opinion within a reasonable degree of medical certainty, Officer Thomas also suffers from Post-Traumatic Stress Disorder ("PTSD"), which is known to impair and impede memory.  He has also been diagnosed with depression and anxiety, which his records indicate to be severe.  Further, many of Officer Thomas's symptoms (mood swings, crying without instigation, impulsiveness, aggressive behavior, memory loss, etc.) meet the criteria for Pseudobulbar Affect ("PBA"), a disease process that affects the brains of individuals who suffer from frontal lobe damage, which may exponentially increase impairment of the patient's memory.

9.

Specific symptoms of depression, specifically when coupled with anxiety, are memory loss and cognitive impairment.

10.

In my expert opinion within a reasonable degree of medical certainty, it was highly unlikely that Officer Thomas could have identified Jamil Joyner as his shooter given the traumatic event (being shot in the head with resulting frontal lobe damage) which occurred immediately prior to Officer Thomas allegedly seeing the person who shot him and his medical conditions (in addition to frontal lobe damage) including:  PTSD, depression, anxiety and PBA, all of which are known to cause memory loss and/or cognitive impairment.

11.

Therefore, in my expert opinion within a reasonable degree of medical certainty, Officer Thomas's identification of Jamil Joyner as the individual who shot him on August 30, 2005, is not credible.[34]

## 2.  Affidavit of Vincent Walker

Walker was petitioner's co-defendant, also having been charged with the attempted first degree murders of Thomas and his partner, Officer John Mitchell.  Walker has supplied an affidavit which states in pertinent part:

---

[34] Rec. Doc. 51-1, pp. 67-69.

4.

I was tried as a co-defendant with Jamil Joyner in the case which is the subject of this litigation.  I was acquitted of all charges by the jury.

5.

Because I was also on trial for attempted first degree murder, I chose to exercise my right against self-incrimination and not testify at trial.

6.

If I had testified at trial and been asked the appropriate questions, I would have testified to the information contained herein under oath before the jury.  I am prepared to offer this testimony under oath and subject to cross-examination if I am called to testify at any hearing in this matter.

7.

After being arrested, but prior to trial, I never spoke with Jamil Joyner, or any attorney or investigator working on his behalf, about the case.

8.

I was an eyewitness to the events which led to Jamil Joyner being arrested on August 30, 2005, and specifically the shooting of Officer Kevin Thomas.

9.

On that date while at the Chevron station in Algiers, Officers Thomas and Mitchell approached me, Jamil, Montanez Thomas and Sye Carter.

10.

We all knew and understood that they were police officers as we approached them peacefully for the sole purpose of requesting relief assistance.

12. [sic]

Officer Thomas was negative and aggressive toward us from the moment we made contact.  In my opinion, we did nothing to provoke this hostility.

13.

When Officer Thomas became hostile, I and Jamil Joyner attempted to calm everyone down.

14.

I specifically remember Jamil telling Officer Thomas, "this isn't necessary, brother; we did not come here for this."

15.

It was at that point that Officer Thomas struck Jamil and aimed the long gun he had strapped across his chest at me.

16.

When he aimed the weapon at me, I was in fear for my life and grabbed the weapon.

17.

Officer Thomas then turned, pulling the weapon away from me as I held on and starting a scuffle over the weapon.

18.

As Officer Thomas and I wrestled over his weapon, I was facing the Chevron and saw Officer Mitchell ran out of the store with a firearm drawn and pointed in our direction.

19.

Officer Mitchell fired his weapon in our direction.

20.

It was at this point that I was shot in the shoulder and Officer Thomas was shot in the head.

21.

I never saw Jamil act disrespectfully toward, curse at or become uncooperative with Officer Thomas during the entire encounter on August 30, 2005.

22.

At no time during the entire encounter on August 30, 2005, did Jamil Joyner raise, point or fire a weapon of any kind at Officer Kevin Thomas, Officer John Mitchell or anyone else present at the Chevron station that day.

23.

When he was arrested along with me, Montanez Thomas and Sye Carter, on August 30, 2005, Jamil obeyed every command from the officers without exception. Jamil never threatened anyone.

24.

I declare under penalty of perjury under the laws of the State of Louisiana and the United States of America that the foregoing is true and correct.[35]

---

[35] Rec. Doc. 51-1, pp. 19-22.

### 3.  Statements by Thomas Reported in the Media

The next evidence offered in support of the actual innocence claim are two media reports concerning the shooting.  The first is a print-out of an article written by Paul Purpura from the website of The New Orleans Times-Picayune newspaper which contains the following sentence: "'I can't remember a lot about the shooting,' Thomas, 41, a 1982 graduate of Alcee Fortier High School, said Tuesday."[36]  The second is a television news interview in which Thomas recounted the events of the shooting and concluded by saying, "And that's all I remember."[37]

### 4.  Thomas's Disciplinary Records

Also offered as evidence are excerpts from Thomas's disciplinary records concerning two past incidents in which he allegedly engaged in aggressive behavior.  In the first incident, Thomas allegedly struck a fellow officer in a fight.  The incident resulted in Thomas being suspended and terminated from the New Orleans Police Department; however, the termination was rescinded on appeal.  In the second incident, Thomas allegedly maced a suspect, refused to take the suspect to the hospital, and physically attacked a superior officer who tried to correct him.

### 5.  Officer Mitchell's Prior Testimony

As he did at petitioner's trial, Officer Mitchell had previously testified at a motion hearing in this case and at a pretrial hearing and the trial in Sye Carter's case.  On all occasions, Mitchell testified that, as far as he knew, Carter was the only one of the four suspects armed at the time of the incident.

---

[36] Rec. Doc. 51-1, p. 81.
[37] Petitioner's counsel has not provided a copy of the video to the Court, but the undersigned has viewed the video at the YouTube link noted in counsel's Reply brief.  Rec. Doc. 51, p. 28 n.12.

In its sur-reply, the state argues that Cardelli's affidavit, the news reports, Thomas's disciplinary records, and Mitchell's prior testimony should not be considered by the Court in connection with petitioner's actual innocence claim because they are not "new" evidence within the meaning of Schlup/Perkins.  The state is correct.

What qualifies as "new" evidence in that context is admittedly unclear.  As the United States Fifth Circuit Court of Appeals recently observed:

> The Supreme Court has not explicitly defined what constitutes "new reliable evidence" under the Schlup actual-innocence standard, and there is a circuit split.[FN 1]  "This court has yet to weigh in on the circuit split concerning what constitutes 'new' evidence." Fratta v. Davis, 889 F.3d 225, 232 (5th Cir. 2018).
>
> > [FN 1]  See Wright [v. Quarterman,] 470 F.3d [581,] 591 [(5th Cir. 2006)] (collecting cases).  The disagreement centers on whether "new reliable evidence" for the purpose of the Schlup actual innocence gateway must be newly discovered, previously unavailable evidence, or, instead, evidence that was available but not presented at trial.  Compare Osborne v. Purkett, 411 F.3d 911, 920 (8th Cir. 2005) (holding that evidence is "new" only if it was unavailable at trial and could not have been discovered earlier through due diligence), and Amrine v. Bowersox, 238 F.3d 1023, 1028 (8th Cir. 2001) (same), with Riva v. Ficco, 803 F.3d 77, 84 (1st Cir. 2015) (considering newly presented evidence "of opinions from a psychiatric expert that [petitioner] recently retained"), Rivas v. Fischer, 687 F.3d 514, 543 (2d Cir. 2012) (finding that "new evidence" is "evidence not heard by the jury"), Gomez v. Jaimet, 350 F.3d 673, 679 (7th Cir. 2003) ("All Schlup requires is that the new evidence is reliable and that it was not presented at trial."), and Griffin v. Johnson, 350 F.3d 956, 963 (9th Cir. 2003) (holding that "habeas petitioners may pass Schlup's test by offering 'newly presented' evidence of actual innocence").

Hancock v. Davis, 906 F.3d 387, 389-90 (5th Cir. 2018).

> Nevertheless, the Fifth Circuit went on to hold:

> Evidence does not qualify as "new" under the Schlup actual-innocence standard if "it was always within the reach of [petitioner's] personal knowledge or reasonable investigation."  Moore [v. Quarterman], 534 F.3d [454,] 465 [(5th Cir. 2008)].  Consequently, though we have not decided what affirmatively constitutes "new" evidence, *we have explained what does not*.

Id. at 390 (emphasis added).

The foregoing holding precludes the Court's consideration of Cardelli's affidavit. The record reflects that defense counsel was in possession of Thomas's medical records prior to trial.[38] Therefore, if he had desired to do so, defense counsel could have obtained an expert opinion at that time concerning Thomas's ability to remember the shooting. See id. (holding that affidavits could not be considered "new" evidence to overcome the statute of limitations unless they were unavailable to the petitioner or his counsel before or at trial).

Similarly, the pretrial media reports were publicly available before trial and, therefore, could have been discovered and used by defense counsel through reasonable investigation.

Thomas's disciplinary records likewise are not "new" evidence; on the contrary, defense counsel had them in his possession prior to trial and wanted to use them at trial. Although the trial court excluded them as inadmissible,[39] that fact does not suffice for them to now be considered

---

[38] State Rec., Vol. 12 of 20, State's Inventory to Discovery; State Rec., Vol. 15 of 20, trial transcript, p. 231, lines 4-5.

[39] On direct appeal, the Louisiana Fourth Circuit Court of Appeal held that the exclusion was proper:

> Mr. Joyner's fourth assignment of error is that the trial court erred in barring the defense from introducing Officer Thomas' personnel file to attack the officer's credibility or to impeach him. Mr. Joyner submits that the personnel file included the following: an unprovoked attack on a fellow officer, a neglect of duty charge, an insubordination violation of departmental rules, a lack of truthfulness charge, and a mishandling evidence and mishandling an injured subject charge.
>
> Mr. Joyner cites no statutory authority (such as a Louisiana Code of Evidence article) in support of his argument that the personnel file was admissible to attack Officer Thomas's credibility or to impeach him. Instead, he cites State v. Cureaux, 93-0838 (La.App. 4 Cir. 10/27/94), 645 So.2d 1215, for the proposition that a defendant can impeach an officer's testimony that he had been a police officer for four years with extrinsic evidence that the officer had been suspended for sixteen months. Mr. Joyne's [sic] characterization of this court's holding in Cureaux is not entirely correct.
>
> In Cureaux, the issue was whether the trial court erred in denying the defendant's motion for a new trial based on the discovery of new evidence -- a newspaper article published after the defendant's August/September 1992 trial. The newly discovered evidence was that one of the arresting police officers testified at the trial that he had been a NOPD officer for four years; however, the officer was suspended from the department from September 1988 to January 1990 for cheating on an examination. In addressing this issue, this court stated:
>
>> Although the defendant could impeach Officer Taylor's testimony that he had been a police officer for four years with extrinsic evidence that Officer Taylor had been suspended from the police force for some sixteen months, the defendant

"new" evidence.  See Fratta v. Davis, 889 F.3d 225, 232 (5th Cir. 2018) (holding that ballistics report known to the defense but excluded as inadmissible hearsay at trial did not qualify as "new" evidence).

As to Mitchell's prior testimony in this case and in Sye Carter's case, defense counsel obviously could have obtained transcripts of those proceedings prior to the trial in this matter if he desired.

Because Cardelli's affidavit, the news reports, Thomas's disciplinary records, and Mitchell's prior testimony are not "new" evidence, they are not properly considered by this Court in determining whether petitioner has stated a colorable claim of actual innocence.[40]

---

> could not have gone into the basis for the suspension under LSA-C.E. art. 608 B.12 ...  There is a real risk that once the fact of Officer Taylor's suspension is raised, the reason for the suspension (Officer Taylor's alleged cheating on an examination) would be explored.  In turn, the reasons for Officer Taylor's reinstatement would be delved into.  As a result, evidence of these collateral issues related to Officer Taylor's credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.  We find no abuse in the trial court's discretion in denying the motion for new trial.

Cureaux, 93-0838, p. 5, 645 So.2d at 1218.  What this court classified as permissible impeachment evidence in Cureaux was the fact the officer was suspended for sixteen months, not the basis for the officer's suspension.  In so finding, this court, citing La. C.E. art. 608(B), stated that evidence as to the basis for the officer's suspension was inadmissible.

In his assignment of error, Mr. Joyner does not address La. C.E. art. 608(B).  Nor does Mr. Joyner contend that he sought to admit only the fact that Officer Thomas had been suspended.  Instead of citing any specific discipline imposed on Officer Thomas, Mr. Joyner cites "particular acts" by Officer Thomas -- his striking another officer, being insubordinate, being untruthful, and mishandling evidence.  Mr. Joyner does not suggest that Officer Thomas was convicted of any criminal offense in connection with these cited particular acts.  Nor does he suggest that he had a constitutional right to present evidence of these cited particular acts.  Under these circumstances, evidence of these cited particular acts was inadmissible to attack the credibility of Officer Thomas or to impeach him.  The trial court thus properly denied Mr. Joyner the right to present such evidence.  There is no merit to this assignment of error.

State v. Joyner, 107 So. 3d 675, 692-93 (La. App. 4th Cir. 2012); State Rec., Vol. 16 of 20.

[40] Nonetheless, out of an abundance of caution, the Court notes that those pieces of evidence are far from convincing in any event.

The news reports are ambiguous at best.  From Thomas's comments documented therein, it is unclear to what extent he is stating that his memory was impaired.  He certainly does not say in either news report that he did not remember who shot him.  On the contrary, his statements in the reports are not inconsistent with his trial testimony

Lastly, as for Walker's affidavit, the Court finds that evidence does qualify as "new," a point which even the state does not seriously contest.[41]  However, the actual innocence exception requires that the proffered evidence not only be new, but that it also be *reliable*.  House, 547 U.S. at 537 ("[T]o be credible a gateway [actual innocence] claim requires new *reliable* evidence …." (emphasis added)).  Moreover, in assessing reliability, it is appropriate for a court to "consider how the *timing of the submission* and the *likely credibility of the affiants* bear on the probable reliability" of the proffered new evidence.  Schlup, 513 U.S. at 332.  Those factors weigh against petitioner in this case.  At the time Walker executed the affidavit, he had already been acquitted of the charges stemming from his role in the incident. Where, as here, an affiant has very little to lose by providing his co-defendant with an exculpatory affidavit, the timing is suspect.  See, e.g., Berry v. Montgomery, Case No. 16-0554, 2017 WL 8895376, at *15 (C.D. Cal. Feb. 21, 2017) ("[Affiants] were both members of the same gang as Petitioner and had nothing to lose in providing their statements because both had been acquitted of the crimes."), adopted, 2017 WL 1393011

---

that he remembered the incident up through the shooting and petitioner's flight from the scene but nothing *thereafter*. See, e.g., State Rec., Vol. 15 of 20, trial transcript, p. 255.

The disciplinary reports are of negligible value.  At most they show that Thomas, on occasion, had acted out in an aggressive manner.  Obviously, it does not necessarily follow that he did so on the day he was shot.  Moreover, even if he did, that is largely immaterial.  Even if a suspect is being disrespected by a police officer that does not justify the suspect shooting the officer in the head or serve as any defense whatsoever to a resulting attempted first degree murder charge.  It is difficult to imagine that this evidence, even if considered by the jury, would have had any impact on the verdict.

Mitchell's prior testimony was likewise of no real value because it was simply consistent with the testimony he offered in person at petitioner's trial.  Therefore, it was merely cumulative.

Cardelli's affidavit is the most useful to petitioner, but even it is far from compelling.  Cardelli was not involved in Thomas's treatment and, for that matter, had not even met him.  Moreover, Thomas provided compelling testimony at trial that he remembered being shot in the head by petitioner, and he did not waver from that testimony despite vigorous cross-examination.  State Rec., Vol. 15 of 20, trial transcript, pp. 236-64.  It is highly unlikely that the jurors would have been inclined to find him to be a liar on that point based merely on the "expert" conclusion of a nurse practitioner that, in her opinion, Thomas, whom she had never met, would be unable to remember the shooting.

[41] Rec. Doc. 55, p. 18 ("Only in the case of the testimony of Vincent Walker, a co-defendant of Joyner's who chose to exercise his right to remain silent, can one arguably speak of evidence that was not available to Joyner at the time of trial.").

(C.D. Cal. Apr. 12, 2017), aff'd, 757 F. App'x 557 (9th Cir. 2018); cf. United States v. Simmons, 714 F.2d 29, 31-32 (5th Cir. 1983); United States v. Metz, 652 F.2d 478, 481 (5th Cir. 1981). Further, Walker is apparently Joyner's uncle.[42]  Exculpatory evidence provided by a relative is similarly suspect.  See, e.g., Porter v. Adams, No. CV F 03-6431, 2007 WL 2703195, at *9 (E.D. Cal. Sept. 14, 2007) ("[I]n order to be credible, a claim of actual innocence requires the petitioner to support his allegations of constitutional error with new reliable evidence that was not presented at trial.  The court finds the declarations offered by Petitioner to be rather low in terms of reliability, both because of their tardy presentation and because the declarants, consisting of Petitioner and his family members, are hardly disinterested witnesses." (citation, quotation marks, and ellipsis omitted)).

In any event, even if Walker's affidavit is deemed sufficiently reliable to be considered, it is not sufficiently compelling to support a finding of actual innocence.  Even if Walker had testified at trial, his testimony would simply have presented yet another inconsistent account as to what occurred.  It would be entirely inconsistent with the account given by the victim, Kevin Thomas, and there is also reason to believe that it would have been somewhat inconsistent with the account given by Montanez Thomas.[43]  The end result, therefore, would have been nothing more than a "swearing match."  At most, Walker's evidence might perhaps have given rise to reasonable doubt in the minds of *some* jurors.  However, that does not suffice: "The meaning of actual innocence

---

[42] Petitioner is Montanez Thomas's brother.  State Rec., Vol. 15 of 20, trial transcript, p. 273.  Walker is Montanez Thomas's uncle.  Id. at p. 277, lines 28-29.  Therefore, it would appear that Walker is also petitioner's uncle.

[43] For example, in a prior affidavit executed by Walker, he stated that "at no time during the entire encounter with Officer Kevin Thomas on August 30, 2005 did he line any of us up, attempt to or conduct a search any [sic] of us, or speak any official commands to us."  State Rec., Vol. 11 of 20, Affidavit of Vincent Walker dated March 5, 2011, p. 2, ¶ 12.  That contradicts Montanez Thomas's testimony at trial.  State Rec., Vol. 16 of 20, trial transcript, pp. 279-81.

… *does not merely require a showing that a reasonable doubt exists* in the light of the new evidence, *but rather that no reasonable juror would have found the defendant guilty*." Schlup, 513 U.S. at 329 (emphasis added); accord Bosely v. Cain, 409 F.3d 657, 665 (5th Cir. 2005) ("At best, [petitioner]'s new evidence shows that a reasonable doubt could have been found to exist; it fails, however, to satisfy his burden of showing that no reasonable juror would have found him guilty. … [W]e are left with a classic swearing match. … [Petitioner] failed to establish that it is more likely than not that no reasonable juror would choose to believe [the victim's] account over those accounts offered by [other witnesses].  As a result, we cannot conclude that it is more likely than not that no reasonable juror would have convicted [petitioner]."); Crayton v. Cain, Civil Action No. 02-2162, 2013 WL 5305673, at *5 (E.D. La. Sept. 19, 2013) ("[A] petitioner does not make a colorable "actual innocence" claim simply by showing that, in light of his new evidence, his guilt is questionable or that reasonable doubt is conceivable." (quotation marks omitted)).

Because petitioner is not entitled to further statutory tolling, and because he has not established either that he is eligible for equitable tolling or that he is actually innocent, his federal application for habeas corpus relief had to be filed no later than **October 14, 2015**, in order to be timely.  His application was not filed until **November 25, 2016**, and, therefore, it is untimely.

## RECOMMENDATION

It is therefore **RECOMMENDED** that Jamil Joyner's federal application for habeas corpus relief be **DISMISSED WITH PREJUDICE** as untimely.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from

38

attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this nineteenth day of June, 2019.


**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**